# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| HEATHER CUMMINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO.: |
| v. ) | |
| ) | |
| GFL ENVIRONMENTAL INC.; ) | |
| WASTE INDUSTRIES; ) | |
| WASTE SERVICES OF ) | JURY TRIAL DEMANDED |
| TENNESSEE LLC; and ) | |
| CHAD KEELEAN ) | |
| Defendants. ) | |

## COMPLAINT

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991. Plaintiff Heather Cummins brings this Complaint against defendants GFL Environmental Inc., Waste Industries, Waste Services of Tennessee, LLC, (collectively "GFL"), and Chad Keelean for engaging in unlawful employment practices on the basis of sex, and subjecting her to sexual harassment and a hostile work environment. Defendants, a Canadian-based, waste management company, claim to support women, treat its female employees equally, and provide them with a safe work environment. In reality, however, GFL harbored and protected one of its male supervisors, defendant Keelean, despite knowing that he had a pattern of engaging in hostile and sexually abusive conduct towards its female employees. In this case, as detailed more fully below, Keelean subjected Ms. Cummins to severe and pervasive sexual harassment for months. Then, when she finally complained, GFL engaged in a variety of intimidation tactics, including an agreement that if it were to compensate her for her emotional distress, she would have to resign from her job, agree never to attempt to work for GFL again, maintain confidentiality, and

also adhere to a non-compete agreement, which would have forced her to find an entirely new career.

## JURISDICTION AND VENUE

1. This is an action for declaratory and monetary relief caused by defendants' violations under the Tennessee Human Rights Act ("THRA"), T.C.A. § 4-21-101 et seq., and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

2. This Court has jurisdiction over this action because defendants' adverse employment actions occurred in Montgomery County, Tennessee.

3. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1343, 1337, 1343, and 1345, and 1367(a). Venue is proper under 28 U.S.C. 1391.

4. Prior to filing, plaintiff complied with all conditions pursuant to 42 U.S.C. § 2000e et. seq, to wit: she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of GFL's unlawful employment practices; the EEOC issued plaintiff a Notice of Right to Sue on March 22, 2021; and, this action was commenced within 90 days of receipt of the EEOC's Notice of Right to Sue.

## PARTIES

5. Plaintiff, Heather Cummins, is a resident of Montgomery County, Tennessee, and was an employee of defendant employers, working at its Clarksville, Tennessee office, from September 2018 until October 2020.

6. Defendant GFL Environmental Inc. was plaintiff's employer and thus is an "employer" for purposes of Title VII. For all times relevant, GFL Environmental, Inc. has been a foreign corporation doing business Montgomery County, Tennessee, and has continuously had at least 15 employees. GFL Environmental Inc.'s is publicly traded on the Toronto Stock Exchange

and its stock is listed as "GFL." GFL is the largest private environmental services company in North America, with locations in 10 U.S. states, and every Canadian province. GFL employs approximately 9,500 people in the U.S. and Canada.

7. Defendant Waste Industries of Tennessee, LLC was plaintiff's employer and thus is an "employer" for purposes of Title VII. Waste Industries of Tennessee, LLC is a Delaware corporation doing business in Montgomery County, Tennessee.

8. Defendant Waste Industries, LLC was plaintiff's employer and thus is an "employer" for purposes of Title VII. Waste Industries, LLC is a North Carolina limited liability company doing business in Montgomery County, Tennessee.

9. In November 2018, defendant GFL Environmental Inc. acquired defendants Waste Industries of Tennessee, LLC, and Waste Industries, LLC (hereinafter collectively referred to as "GFL"). At all relevant times, GFL has continuously engaged in an industry affecting commerce within the meaning of Sections 702(b), (g), (h) of Title VII, 42 U.S.C. § § 2000e(b), (g) and (h).

10. Defendant Chad Keelean is a former employee for GFL. At all relevant times, he was a resident of Montgomery County, Tennessee. Keelean publicly claims that he has worked for Republic Services, Inc. since 2013. This is false. At all times relevant, Keelean hired Ms. Cummins and was also her direct supervisor at GFL.

## **STATEMENT OF CLAIMS**

11. GFL publicly claims that "the health and safety of our employees, customers, and the communities we serve is our number one priority, and incorporated into every stage of what we do." This is false.

12. GFL publicly claims that it maintains a "Safe for Life" culture with an "ongoing pledge to the health and safety of every worker." This is false.

13. In fact, when an investment company conducted a recent forensic financial and accounting review of GFL, that included interviews with former employees, it determined that GFL engaged in business practices that would put shareholders at risk. For example, one former employee said, "You don't want anything to do with them," when asked if GFL was highly ethical. Another former employee said, "I also had ethical concerns and had no interest in continuing with the company."

14. In September 2018, Ms. Cummins applied for GFL's Branch 84-Territory Account Manager position, located in Clarksville, Tennessee. Ms. Cummins was interviewed by defendant Chad Keelean, Branch 84's then-General Manager. Keelean immediately offered Ms. Cummins the job with a base salary of $45,000.00, plus commission.

15. Immediately upon her hiring, Keelean began to discriminate against Ms. Cummins, specifically by engaging in severe and pervasive sexual harassment.

16. Prior to Ms. Cummins' hiring, upon information and belief, another female employee filed a complaint about Keelean's discriminatory conduct.

17. Keelean consistently defended his sexual harassment as "jokes" when she rejected his advances or questioned his conduct.

18. Keelean often packaged his discriminatory conduct with intimidating statements, including but not limited to incessantly bragging about his clout in the waste industry, and that he owned tens-of-thousands of pre-IPO shares, if the company were to go public.

19. On the evening of October 29, 2018, Keelean called Ms. Cummins, who had just checked-in to her Nashville, Tennessee, hotel room for a company gathering, and asked her for

her room number. When she refused to give it to him, he told her to "relax" because he was "joking."

20. A few weeks later, in November 2018, Keelean announced that he was holding a group sales meeting at a driving range. When Ms. Cummins objected to this choice of venue for a meeting, Keelean responded, "What do I get?"

21. In early January of 2019, Keelean called Ms. Cummins and asked her what was wrong because, according to him, she seemed "stressed." When Ms. Cummins stated that she sometimes felt intimidated by him, he said, "I would fuck you too."

22. Keelean told Ms. Cummins that his wife did not want to have sex with him because her hormones were "screwed up" since having their baby. Keelean stated that he wanted to find a woman who had "just as much to lose" as he did, suggesting that Ms. Cummins, a married woman, would be interested in a secret affair.

23. The next day, Keelean asked Ms. Cummins to send him pictures of herself. Again, attempting to avoid his innuendo, she sent him a group picture of the sales reps, standing in front of a company building. Keelean responded something to the effect of, "Not those pictures." When Ms. Cummins said, "No," Keelean pushed back, stating, "I know you have them," and then finally retreated with, "Haha, I play a lot."

24. In January 2019, before a sales conference that was being held in Raleigh, North Carolina, Keelean told Ms. Cummins, "You know it's inevitable we play 'Hide the Tip' at the conference, right?"

25. On March 8, 2019, Keelean asked Ms. Cummins to meet him at a Clarksville restaurant for lunch and texted, "Let's make it our sales meeting." During the "meeting," Keelean proceeded to tickle her fingers as she sat frozen with fear. Keelean then asked her, "Do you

swallow?" Ms. Cummins brushed off the sexual innuendo. At the end of the "meeting," Keelean invited her to "day drink," on the company dime, with him at Tilted Kilt, a local "breastaurant," which she declined.

26. On May 1, 2019, Keelean scheduled another lunch meeting with Ms. Cummins at a Clarksville restaurant. When she arrived, he offered her an alcoholic drink, which she declined. Soon after she sat down, Ms. Cummins received a business call and removed herself from the table. When she returned, Keelean was paying the bill. He then walked out and never discussed a single business matter with her.

27. On June 18, 2019, before another conference, in Atlanta, Georgia, Keelean sexually harassed Ms. Cummins, via text, for approximately seven (7) hours, including but not limited to the following comments:

    A. I'm staying next to the ballfield in Atlanta tonight. I have a couch. I will get you tickets to game;"

    B. "Get my room next to yours;"

    C. "Haha, stop being up tight, these trips are to relax, I just like messing with you;" and,

    D. "You puss," followed by a picture of Donald Trump.

28. Following the close of the conference, on June 20, 2019, Ms. Cummins chose to avoid the social gathering with her colleagues, in fear of having to submit herself to Keelean's sexual harassment. When Keelean recognized her absence, he texted her from approximately 11:20 pm until 1:00 am, including but not limited to:

    A. "Where did you go?"

    B. "Puss;" and,

        C.      "You already out?"

29. The next morning, at approximately 5:30 am, on June 21, 2019, Ms. Cummins texted Keelean, "You need to stop." In response, Keelean sent her a stream of hostile and harassing texts throughout the entire day, including but limited to:

        A.  "Just joking around with you;"

        B.  "Just trying to lighten up everything;"

        C.  "Your (sic) still my favorite sales lady hahahah;"

        D.  "I know I joke but that's because I consider us friends..." and,

        E.  "I thought we were on the level of trust to joke."

30. When Keelean recognized that Ms. Cummins had not responded to any of his texts, he became more hostile and began to retaliate against her for rejecting his advances. After the end of the work day, Keelean emailed Ms. Cummins a 6-point list of work he expected her to complete, as if she were on a Performance Improvement Plan, including but not limited to requiring she have a weekly meeting with another superior to discuss plans and markets, requiring she provide him with an update on her pipeline, and requiring she email him a briefing on her meetings. Ms. Cummins had never had a performance issue with the company.

31. On June 21, 2020, Ms. Cummins reported Keelean to Human Resources and an interview was conducted over the phone.

32. Then, on July 3, 2020, after Ms. Cummins returned from her pre-scheduled vacation, GFL sent two people to meet with Ms. Cummins, in person at her office in Clarksville. During this "meeting," she was told that the company had a "zero tolerance policy" with regard to sexual harassment but that Keelean would continue to run both Clarksville and Nashville branches and that she would have to continue to work with him.

33. When Ms. Cummins rejected to the resolution, the two "investigators" attempted to intimidate her and told her that she was in violation the drug and alcohol policy. They explained that when she stated, in her own complaint, that that she had single drink with Keelean during one of his meetings where he sexually harassed her, this was a violation of company policy. The company also defended Keelean's conduct as "joking."

34. The company then continued to escalate its hostile intimidation tactics. On July 29, 2019, GFL's senior director of Human Resources, Tanika McCulloch, emailed Ms. Cummins that she was flying in from Raleigh, North Carolina, and that she wanted to meet with Ms. Cummins away from the office. She wrote, "Take care in your response: if you continue to reject my reasonable request to talk in person during working hours about the complaint you submitted, the Company may consider your conduct to amount to insubordination, which is a disciplinary offense."

35. Defendants do not have a policy that requires employees to meet off-site to discuss legitimate complaints with legal significance.

36. Then, Ms. Cummins stated that she wanted to be compensated for her damages, GFL responded with more hostility. The company stated that the only way it would compensate her was if she resigned from her job, agreed to never work for the company again, and agree to remain bound by the non-compete agreement she signed upon her hiring. When Ms. Cummins refused, the company refused to resolve the matter.

37. Defendants' conduct caused Ms. Cummins extreme emotional distress.

## COUNT I
### (Sex Harassment under the THRA against Defendant GFL)

38. Plaintiff restates and incorporates herein the allegations in the above paragraphs.

39. As described above, the employer-defendants discriminated against plaintiff based on her sex in the terms and conditions of employment by subjecting her to conditions that men did not have to endure.

40. In addition, the employer-defendants subjected plaintiff to sexual harassment and/or a hostile work environment, which was severe or pervasive and both objectively and subjectively offensive.

41. Plaintiff objected to, and reported, defendant's sexual harassment. Defendant failed to remedy and/or prevent sex harassment in the workplace in a prompt and effective manner. Further, defendants were aware of the hostile work environment and Keelean's history of sexual harassment.

42. The employer-defendants are vicariously liable for the sexually hostile work environment, Keelean's sexual harassment of plaintiff, and are liable for failing to remedy sex harassment in the workplace.

43. As a direct and proximate result of the employer-defendants' unlawful acts, plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and, at times, lost earnings and benefits.

**COUNT II**
**(Sex Discrimination/Harassment/Retaliation under Title VII**
**Against All Defendants)**

44. Plaintiff restates and incorporates herein the allegations in the above paragraphs.

45. Plaintiff was subjected to severe or pervasive sexual harassment and discrimination in defendants' workplace because of her sex, female.

46. When plaintiff reported and/or objected to sexual harassment she was ignored. When she attempted to remedy the situation, defendants' engaged in additionally hostile conduct in an attempt to force her to resign.

47. The employer-defendants are vicariously liable for defendant Keelean's sexual harassment of plaintiff, and are liable for failing to remedy sex harassment in the workplace.

48. As a direct and proximate result of defendants' unlawful acts, plaintiff suffered and continues to suffer emotional and physical injury, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience, lost earnings, attorney's fees, costs, interest and any other legal and equitable relief to which she may be entitled.

## COUNT III
### (Intentional Infliction of Emotional Distress against All Defendants)

49. Plaintiff restates and incorporates herein the allegations in the above paragraphs.

50. Defendants engaged in extreme and outrageous conduct toward Plaintiff. Keelean's battery and sexual harassment of Plaintiff was intentional or reckless, outrageous, not conduct tolerated in our society, which were intended to and did cause serious physical and mental injury.

51. Corporate Defendant intended to cause emotional distress or recklessly disregarded whether its conduct would cause emotional distress.

52. All Defendants conduct caused Plaintiff severe emotional distress.

## PRAYER FOR RELIEF & JURY DEMAND

53. WHEREFORE, premises considered, Plaintiff prays for the following relief:

    A.    Judgment against Defendants for violations of state and federal law;

    B.    Monetary award of damages for Back Pay and Front Pay;

    C.    Pre- and post-judgment interest;

D. Compensatory Damages and Punitive Damages;

E. Attorney's fees and costs, and expenses of the action;

F. All other legal and equitable relief to which Plaintiff shows she is entitled, and which is just and proper; and,

G. A jury trial.

Respectfully submitted,

*/s/ Tamara Holder*
Tamara N. Holder
The Law Firm of Tamara N. Holder LLC
917 West Washington Blvd., Suite 222
Chicago, Illinois 60607
312-818-3850
tamara@tamaraholder.com
*To Be Admitted Pro Hac Vice*

*/s Anne Bennett Hunter*
Heather Moore Collins BPR # 026099
Anne Bennett Hunter BPR # 022407
Collins & Hunter PLLC
7000 Executive Center Drive, Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@collinshunter.com
anne@collinshunter.com
*Local Counsel*

*Attorneys for Plaintiff*